## Commonwealth v. Rudd-Melikian, Inc.

*Robert D. Myers*, for appellant.

*Edward T. Baker*, for Commonwealth.

HERMAN, J., November 21, 1966.—This is an appeal by Rudd-Melikian, Inc., from resettlement of its capital stock tax for the fiscal year ended June 2, 1961, made on September 11, 1963, by the Department of Revenue, pursuant to section 1105 of The Fiscal Code, Act of April 9, 1929, P. L. 343, as amended, 72 PS §1105, and approved by the Department of the Auditor General on September 16, 1963.

The initial settlement made by the Department of Revenue and approved by the Auditor General re-

sulted in a settled tax in the amount of $977.90. The subsequent *re*settlement resulted in an increase of $980.16, which produced a total tax in the amount of $1,958.06. Thereafter, appellant filed a petition for review with the Board of Finance and Revenue, but the board refused said petition and sustained the resettlement of the Department of Revenue and the Department of the Auditor General.

This appeal from the decision of the Board of Finance and Revenue refusing appellant's petition for review of the resettlement of its capital stock tax for the fiscal year ending June 2, 1961, was heard, as stipulated by the parties, without a jury, in accordance with the Act of April 22, 1874, P. L. 109, 12 PS §688. The parties also stipulated certain facts, and additional facts not stipulated were adduced at a hearing. From the stipulation and the hearing, we find the following to be the pertinent facts.

Appellant, a Pennsylvania corporation, with its principal place of business located in Warminster, Pa., was incorporated on May 31, 1946, "to manufacture, buy, sell, install, service, maintain, distribute, let, lease and otherwise deal in coin-operated vending machines and vending and dispensing machines and equipment of all kinds, their parts, supplies and accessories".

The tax in question was imposed under the authority of the Capital Stock Tax Act of June 1, 1889, P. L. 420, as amended by the Act of March 15, 1956, P. L. (1955) 1285, and the Act of August 23, 1961, P. L. 1100, 72 PS §1871, (hereinafter called the "act"), which provides, inter alia: "That every domestic corporation . . . shall be subject to, . . . a tax . . . upon . . . its . . . capital stock. . . ." The act further provides, however, that the tax shall not apply to the ". . . capital stock of corporations . . . organized for manufacturing *or processing* purposes, which is invested in and actually and exclusively employed in

carrying on manufacturing *or processing. . . .*"
(Italics in original.)

In computing appellant's initial tax settlement,
the Department of Revenue and the Department of
the Auditor General treated as exempt from tax that
part of appellant's capital stock invested in and actu-
ally and exclusively employed in the manufacture of
vending machines and the production of frozen liquid
coffee and tea concentrates and roll tapes of finely
ground coffee which were used in the vending ma-
chines. This action taken by the aforesaid departments
was in accordance with settlements for prior years
which granted the exemption to appellant for the man-
ufacture of vending machines, and to Kwik Kafe Cof-
fee Processors of America, Inc., a former subsidiary
of appellant which became merged into appellant dur-
ing the tax year in question for the production of fro-
zen liquid coffee and tea concentrates and the produc-
tion of roll tapes of finely ground coffee. Subsequently,
the departments resettled the tax, treating as taxable
that part of the capital stock invested in and actually
and exclusively employed in the production of frozen
liquid coffee and tea concentrates and roll tapes of
finely ground coffee. Appellant contends that the re-
settlement of its capital stock tax, in disallowing the
exemption for that portion of stock invested in the
production of coffee and tea concentrates and coffee
tapes, constituted an erroneous and improper action.

Appellant's operations relative to the portion of its
capital stock for which the exemption was disallowed
begin with the purchase of large quantities of green
coffee beans, which are received at its plant in War-
minster, Pa. The composition of the beans in their
green state is such that they are without commercial
value or use and are lacking in those characteristics
normally associated with the coffee beverage. Samples
from the various shipments are tested and analyzed

in appellant's laboratory for the purpose of devising blends and determining proper methods of roasting. The bulk of the shipments are then mechanically blended and roasted at a specific heat for a specific period of time in accordance with the formula prepared by the laboratory technicians. The entire roasting procedure is carefully and precisely controlled in order to assure the desired results. Physical and chemical changes occur as a result of roasting the green coffee beans, and they acquire the aroma associated with the coffee beverage.

Appellant uses some of the beans to prepare a coffee concentrate for use in vending machines. The roasted beans are ground and hot water of a desired volume and temperature is mechanically forced through the ground coffee to produce the concentrated coffee liquid which is thereafter canned, frozen, and distributed at wholesale to vending machine operators. The concentrate is automatically diluted with a prescribed amount of water in the machine to produce individual cups of coffee. The methods employed by appellant in obtaining the coffee concentrate are extensively regulated in order to achieve the desired product.

The methods used in producing the tea concentrate do not differ materially from those employed in the production of the coffee concentrate.

The coffee tapes produced by appellant represent a recent innovation in the coffee vending industry, and are used only on vending machines manufactured by appellant. The tapes themselves consist of two layers of paper, each composed of different fiber, between which prescribed amounts of finely ground coffee are heat sealed at certain intervals on the tape. The tapes are inserted into the vending machine in such a position that one pod, upon deposit of a coin into the machine, is enclosed by a cylindrical brewing chamber

through which hot water under pressure is forced to produce a cup of coffee. A fresh pod is advanced into the chamber after each cup of coffee is purchased by the consumer. The amount and blend of the coffee contained in the pods is carefully regulated by appellant to assure the quality of the product as well as the proper functioning of the vending machines. The tapes, which appellant purchases from another source, are likewise carefully cut and sealed to maintain the vending machines in proper operating order.

Appellant contends that the production of coffee and tea concentrates and coffee tapes constitutes "manufacturing" within the meaning of the act. With this position we are unable to agree. The case of Commonwealth v. Glendora Products Co., 297 Pa. 305 (1929), held that the making of roasted coffee was not "manufacturing" within the meaning of the act now before this court. The court there cited with approval its decision in Commonwealth v. Lowry-Rodgers Co., 279 Pa. 361 (1924), wherein it was held that roasting coffee did not constitute "manufacturing" within the exemption of the mercantile tax acts. The court, in deciding the Glendora case, was fully cognizant of the different statutory provisions under which the taxes had been imposed, but stated that even though Lowry-Rodgers involved "the application of the mercantile license tax law, nevertheless, the point for determination was whether the process in question was manufacturing": page 307. In a much more recent case involving the Mercantile License Tax Act of June 20, 1947, P. L. 745, 24 PS §582.1 et seq., the Supreme Court, in passing upon the availability of the manufacturing exemption for defendant-coffee producer, held that decaffeinated and instant coffees were not the result of a manufacturing operation within that act: General Foods Corporation v. Pittsburgh, 383 Pa. 244 (1955).

While we might agree with appellant that the previously cited cases are not necessarily controlling of the issues before this court and the cases can readily be distinguished upon their factual origins, their rationale, when viewed along with other principles enunciated by the court in construing the Capital Stock Tax Act, is extremely persuasive.

Since appellant and its property are within the language of the act imposing the tax, the exempting provision must be strictly construed: Commonwealth v. Berlo Vending Company, 415 Pa. 101 (1964) ; Commonwealth v. Sitkin's Junk Co., 412 Pa. 132 (1963).

"Manufacturing", as here used, must be given its ordinary and general meaning: Pittsburgh v. Electric Welding Company, 394 Pa. 60 (1958) ; Commonwealth v. Weiland Packing Co., 292 Pa. 447 (1928). The court, in Lowry-Rodgers, supra, stated at page 368 that: "merely cleaning and effecting a chemical change in a natural product, however skilful and beneficial the process and its result may be, even though there also occurs an incidental change in the size, form, and weight of that product" was not manufacturing within the purview of that act.

Appellant attempts to distinguish its operations from those in Glendora, Lowry-Rodgers, both supra, and other cases, but we fail to find any distinction that would suggest a different result in the instant case from the results reached in Glendora and Lowry-Rodgers. In the Glendora case, which arose in this county and concerned the identical manufacturing exemption [1] in the same tax statute as we are concerned with here, a great deal of testimony, much of it by experts, described in detail the roasting of coffee beans and the production of vacuum-packed cof-

---

[1] The words *"or processing"* were, of course, added to the exemption some years after the Glendora case was decided, but for the purposes of this part of our opinion, this is unimportant.

fee. In the instant case, appellant's expert had to agree that from the date when Glendora was decided until the present, no basic changes were made in the roasting or grinding of coffee, and that, indeed, in both cases the taxpayer began with green coffee beans and ended with a coffee product; each product in question here actually bearing the name "coffee" — that is, *coffee* concentrate and *coffee* tapes.

It has frequently been stated that expensive machinery and the complexity of the operation do not render that manufacturing which otherwise is not: Armour and Company v. Pittsburgh, 363 Pa. 109 (1949); Rieck-McJunkin Diary Company v. Pittsburgh School District, 362 Pa. 13 (1949); Commonwealth v. Hardes Lumber Corp., 27 D. & C. 2d 657, 77 Dauph. 359 (1961).

As Mr. Justice Cohen said in Commonwealth v. Tetley Tea Company, Inc., 421 Pa. 614, 616 (1966):

"We have defined 'manufacturing' to be the application of skill and labor to materials so that there results a new, different and useful product. Philadelphia School District v. Parent Metal Products, Inc., 402 Pa. 361, 167 A. 2d 257 (1961). To be new and different the manufacturing process must have substantially transformed the ingredients in form, quality and use. Commonwealth v. Berlo Vending Company, 415 Pa. 101, 202 A. 2d 94 (1964); Commonwealth v. Peerless Paper Specialty, Inc., 344 Pa. 283, 25 A. 2d 323 (1942)".

The operations appellant performs are not greatly unlike those involved in the Tetley Tea case. To paraphrase the language of the court in that case: "All this, however, does not make it a 'new and different' product. The process starts and ends with [coffee]". The use to which the roasted coffee can be put (and the roasting of coffee is clearly not manufacturing) is not basically any different from that of the coffee concen-

trate or the coffee tapes. And, at page 617: "Mere convenience, *leading to a greater and wider appeal for a product,* does not make the process by which that convenience is achieved manufacturing within the purview of the statute". (Italics supplied.)

Having concluded that the operations performed by appellant do not constitute manufacturing, we pass to a consideration of its contention that its activities are within the "processing" exemption, as contained in section 21(c) (1) of the act or, in the alternative, section 21(c) (7).

Section 21(c) (1) provides:

"(c) The term processing, as used in this section, shall mean and be limited to the following activities when engaged in as a business enterprise:

"(1) The cooking or freezing of fruits, vegetables, mushrooms, fish, seafood, meats or poultry, when the person engaged in such business packages such property in sealed containers for wholesale distribution".

Section 21(c) (7) provides:

"(7) The production, processing and bottling of nonalcoholic beverages for wholesale distribution".

Since the act contains its own definition of the term "processing", we must accept that definition, and only where there is ambiguity should we be guided by the Statutory Construction Act, which provides, inter alia, that words and phrases in a statute shall be given their common and ordinary meaning: section 23 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §533. In examining 21(c) (1), we are unable to conclude that the legislature intended or envisoned the production of coffee bean derivatives as "the cooking or freezing of fruits, vegetables. . . ." Appellant's expert witness at the hearing testified that the coffee bean is the *seed* of the fruit of the coffee plant; that that part of the plant which is generically termed the fruit by the industry is discarded, and

it is only the seed that is retained. It is plain that the coffee bean is not a "fruit" as that term is commonly and ordinarily used. Furthermore, the statute enumerates certain other additional items, and by application of the doctrine of inclusio unius est exclusio alterius, it is apparent that the legislature did not intend coffee producers to benefit from the exemption, since that body must have been aware of the previous judicial decisions which denied the exemption for coffee roasting.

With regard to section 21(c)(7) of the act, we are unable to find that appellant's operations constitute "the production, processing and bottling of non-alcoholic beverages" within the meaning of the act. With the principles of statutory construction in mind, and construing the exemption strictly, as we must do, it is apparent that coffee and tea concentrates are not "beverages", as that term is commonly and ordinarily understood. From a review of the various operations accorded the exemption under the statutory definition of processing, it is obvious that the enactment was at least partially motivated by a legislative desire to overcome certain prior judicial pronouncements and codify others. See Pillsbury Mills, Inc. v. Pittsburgh School District, 408 Pa. 369 (1962); Atlantic Refining Company Case, 398 Pa. 30 (1959); Commonwealth v. Pepsi-Cola Metropolitan Bottling Co., 77 Dauph. 225 (1961); Commonwealth v. The Philadelphia Coca-Cola Bottling Co., 15 D. & C. 254, 33 Dauph. 421 (1930).

In its specification of objections, appellant raised three additional matters which it neither argued nor briefed.[2] None of them has any merit. Appellant first

---

[2] In its brief, appellant acknowledges that "the only questions presented relate to the availability of the manufacturing and/or processing exemption to Defendant's production of coffee and tea concentrates and coffee tapes".

contends that the action taken by the Board of Finance and Revenue is void, since appellant was not given an opportunity to be heard. There is no requirement that the board afford an opportunity to be heard: Act of April 9, 1929, P. L. 343, art. XI, sec. 1103, as amended by the Act of July 13, 1957, P. L. 838, sec. 14, 72 PS §1103. Any person aggrieved by the action of the board is entitled to a hearing de novo in this court, and such hearing was had in this case.

Secondly, appellant contends that other corporations engaged in the same business have been allowed the exemption and, consequently, resettlement of appellant's capital stock tax is unconstitutional and void as violative of due process under the State and Federal Constitutions. Appellant has not called to our attention any instances where others engaged in the same business have been permitted the exemption, and we know of none. We fail to find any merit to this averment.

Third, appellant objected to the tax computation used by the taxing authorities in arriving at the tax. Neither the stipulation entered into by the parties nor the testimony taken at a hearing produced any facts tending to sustain this objection; nor did appellant argue this point in oral argument or include it in its brief. This objection too, therefore, was not pressed by appellant, and we find no merit in it.

All of appellant's suggested findings of fact and conclusions of law contrary to our findings and conclusions here are severally overruled.

## Conclusions of Law

1. Appellant is a Pennsylvania corporation and is subject to capital stock tax liability under the Act of June 1, 1889, P. L. 420, sec. 21 (a), as amended by the Act of March 15, 1956, P. L. (1955) 1285, and the Act of August 23, 1961, P. L. 1100, 72 PS §1871.

2. Appellant's operations in the production of cof-

fee and tea concentrates and coffee tapes do not constitute either manufacturing or processing under said act, and appellant is, therefore, not exempt from the payment of capital stock tax on such activities.

3. The Commonwealth was correct in its resettlement of appellant's capital stock tax for the fiscal year ended June 2, 1961, and, consequently, the appeal should be dismissed.

4. Judgment should be entered in favor of the Commonwealth and against Rudd-Melikian, Inc., in the amount of $1,958.06, of which $977.90 has been paid.

5. Said judgment, upon payment of $980.16, plus interest, penalty and costs, should be marked satisfied.

### ORDER

And now, November 21, 1966, the appeal is dismissed. Judgment is directed to be entered in favor of the Commonwealth and against Rudd-Melikian, Inc., in the amount of $1,958.06, unless exceptions be filed hereto within 30 days. The sum of $977.90 having been paid, the judgment shall be marked satisfied upon the payment of $980.16, plus interest, penalty and costs according to law.

The prothonotary is directed to notify the parties hereto or their counsel of this order forthwith.